```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3   THE UNITED STATES OF AMERICA,

 4                   Plaintiff,          Case No. 11-20129
        -v-
 5
     SCOTT SUTHERLAND, et al.,
 6
                     Defendant.
 7   _____/

 8   THE UNITED STATES OF AMERICA,

 9                   Plaintiff,          Case No. 11-20066
        -v-
10
     JEFF GARVIN SMITH, et al.,
11
                     Defendant.
12   _____/

13   THE UNITED STATES OF AMERICA,

14                   Plaintiff,          Case No. 12-20387
        -v-
15
     SMILEY VILLA,
16
                     Defendant.
17   _____/

18                      STATUS CONFERENCE

19          BEFORE THE HONORABLE ROBERT H. CLELAND
                  United States District Judge
20          Theodore Levin United States Courthouse
                  231 West Lafayette Boulevard
21                     Detroit, Michigan
                     September 24, 2012
22
     APPEARANCES:
23
     FOR THE PLAINTIFF:   SAIMA MOHSIN
24                        ERIC STRAUS
                          JEROME MAIATICO
25                        LINDA AOUATE
```

```
 1   FOR THE
     DEFENDANTS:              MARK SATAWA
 2                            (Group 1)

 3                            JEROME SABBOTA
                              (Alternate, Group 1)
 4
                              ARTHUR WEISS
 5                            (Alternate, Group 1)

 6                            LOREN DICKSTEIN
                              (Group 2)
 7
                              SIDNEY KRAIZMAN
 8                            (Alternate, Group 2)

 9                            MARGARET RABEN
                              (Group 3)
10
                              WILLIAM SWOR
11                            (Group 4)

12                            GERALD GLEESON
                              (Alternate, Group 4)
13
                              WALTER POOKRUM
14                            (Ledford, D-36)

15

16

17

18

19

20

21

22            To Obtain a Certified Transcript Contact:
         Christin E. Russell, RPR, CRR, FCRR, CSR - (248) 420-2720
23             Proceedings produced by mechanical stenography.
             Transcript produced by computer-aided Transcription.
24

25
```

<u>TABLE OF CONTENTS</u>

<u>Hearing</u>                                                      <u>Page</u>
  Status Conference                                          3


<u>Exhibits:</u>
              (None Offered.)


  CERTIFICATE OF REPORTER                                    83

```
 1   Detroit, Michigan
 2   September 24, 2012
 3   10:10 a.m.
 4                    *              *              *
 5          THE COURT:  Okay.  Let us have the record reflect that
 6   we are in conference in the Court's jury room with the
 7   Government and with liaison counsel, and with one exception,
 8   all of the alternate liaison counsel as well.
 9          And why don't we go around the table and just have you
10   identify yourselves, starting with Mr. Straus.
11          MR. STRAUS:  Eric Straus on behalf of the United
12   States, your Honor.
13          MS. MOHSIN:  Saima Mohsin on behalf of the United
14   States, your Honor.
15          MR. MAIATICO:  Jerome Maiatico on behalf of the United
16   States, your Honor.
17          MS. RABEN:  Margaret Raben on behalf of Group 3.
18          THE COURT:  And you're principal on behalf of group --
19   principal liaison counsel?
20          MS. RABEN:  I am.
21          MR. GLEESON:  Your Honor, Gerald Gleeson, alternate
22   liaison on behalf of Group 4.
23          MR. SWOR:  William Swor, on behalf of Group 4.
24          MR. POOKRUM:  Walter Pookrum for Lauri Ledford.
25          THE COURT:  I'm sorry.  I can't hear you.
```

1            MR. POOKRUM:  For Lauri Ledford, Defendant Ledford.

2            MR. SWOR:  Mr. Pookrum is, his client is part of Group

3    4.

4            THE COURT:  His client is.  Okay.  So you're not a

5    liaison or alternate liaison.

6            Go ahead.

7            MS. AOUATE:  Linda Aouate on behalf of the Government,

8    for forfeiture purposes.

9            THE COURT:  Thank you.

10           MR. SABBOTA:  Jerome Sabbota, liaison for Group 1.

11           MR. SATAWA:  Mark Satawa on behalf of Group 1.

12           THE COURT:  Liaison?

13           MR. SATAWA:  I am the principal liaison, that is

14   correct, your Honor.

15           MR. WEISS:  Arthur Weiss.  I'm an alternate for Group

16   1.

17           MR. KRAIZMAN:  Sidney Kraizman, alternate for Group 2.

18           MR. DICKSTEIN:  Loren Dickstein, the liaison for Group

19   2.

20           THE COURT:  Very good.  And court staff and so forth

21   are here as well.

22           This is a discussion to see if we can organize the

23   case in a sensible way.  I have entered an order actually

24   today, drafted earlier, and now confirming the proposed

25   identification of group liaison counsel, as reflected here

1    today.  I'm not sure which alternate is not -- we have all the

2    principal liaisons here.  There's one, somebody's alternate was

3    not able to attend.  Is that 3?

4            MS. RABEN:  Your Honor, yes.  It is the alternate to

5    Group 3, Michael McCarthy.

6            THE COURT:  Okay.  I think alternates' appearance here

7    is optional, in any event.

8            Let's see.  You know that I've already entered an

9    order that granted in part and denied in part the Government's

10   motion to consolidate and reorganize the filing, the caption so

11   that all three cases are going to be carried on the caption.

12           We, consistent with your collective presentation,

13   entered an order that excluded time for speedy trial purposes.

14   And I organized also this preliminary scheduling conference

15   that contemplated the activities that you've undertaken so far,

16   the creation of, at least putative groupings for these

17   purposes, the liaison and so forth.

18           It seems to me, to the extent that there's any

19   concern, one group, one attorney I think expressed some doubt

20   or concern perhaps about the grouping that was proffered by the

21   Government at the Court's request, and wondered aloud whether

22   there might conceivably be internal *Bruton* type conflicts and

23   things of that sort.

24           I would only observe that it just makes sense to just

25   subdivide and organize and to simply hold for future

1    consideration, if a problem arises, reorganization, splitting

2    off, re-grouping and so forth can be done later.  I'm not aware

3    of any, of any problems presented immediately.  If there are

4    any, I'm happy to hear them to the extent counsel know of them,

5    and maybe suggested resolutions.  But that is my first

6    reaction, in any event, to that observation.

7              Mr. Satawa?

8              MR. SATAWA:  Your Honor, I think a fair summary of the

9    concern is, is that just sort of by way of status quo and the

10   case proceeding forward, that these groups sort of *de facto*

11   become trial groupings.  And, and I think that --

12             THE COURT:  I think not.

13             MR. SATAWA:  Okay.

14             THE COURT:  I think the question of trial grouping

15   should be addressed when we are further into the case, when

16   there has been more analysis.  We shall see how many defendants

17   we have.  I mean, not predicting anything of any particular

18   specificity in this case, but I think we all know that there

19   are defendants who, for one reason or another, drop out as

20   cases progress through discovery and discussion and proffers

21   and the like.  So this has yet to emerge in this case.  And I

22   think that we should reassess the practicality of groupings for

23   trial purposes at a later time.

24             I am presuming in that, that it will ultimately be my

25   decision through orders entered appropriately after reaction

```
 1   from counsel, as to who should be in what group with respect to
 2   trials, that will be a judicial decision.  But you need to
 3   weigh in or have the opportunity, at least, to weigh in from
 4   the various sides.  There may be unanimity, who knows, as we
 5   approach ultimate trial time here.  But that, again, remains to
 6   be seen, based on later events.
 7           So Government counsel suggested an outline, which I
 8   think generally has been agreed to in terms of topics to
 9   discuss.
10           And it is regularly or uniformly observed in your
11   responses, I have responses from each of Groups 1, 2, 3 and 4,
12   that first and foremost, the motions for protective orders need
13   to be resolved.  And I don't know if I have responses from all
14   sides on that motion, or those motions.
15           MR. WEISS:  Well, there are two of them.
16           THE COURT:  I have one in my hand now, that
17   Defendant's response.  I don't know exactly who this is from.
18   It's not identified.
19           MR. SWOR:  Mr. Weiss has filed responses.
20           THE COURT:  Mr. Weiss.
21           MR. SWOR:  To both.  I will be filing a
22   supplemental --
23           THE COURT:  Okay.
24           MR. SWOR:  -- response on behalf of the balance of the
25   defendants.
```

STATUS CONFERENCE - 9/24/2012

1        THE COURT:  And that will, you think that will -- are
2    you going to be able to speak on behalf of all of the other
3    defendants, Mr. Swor?
4        MR. SWOR:  Yes.
5        THE COURT:  And so that those, those briefs and
6    response will be a comprehensive, a comprehensive response from
7    all defendants?
8        MR. SWOR:  That's the purpose.
9        MR. WEISS:  We exchanged e-mails among ourselves,
10   Judge.  And I think Bill and myself have filed or will be
11   filing answers to both motions.  And I think --
12       THE COURT:  I have yours, don't I?
13       MR. WEISS:  That's one of them.  And I filed one last
14   week on the first motion.  And that one just came out.  And
15   it's going to be sent by e-mail to all counsel today, if it
16   hasn't already been sent by my secretary this morning.
17       THE COURT:  When are you going to wrap up your
18   response, Mr. Swor?
19       MR. SWOR:  Within 24 hours.
20       THE COURT:  All right.  So we should be -- so I'll
21   review that.  I'll --
22       MR. SWOR:  I'm sorry.  Within 48 hours.
23       THE COURT:  Two days.  Okay.  So by Wednesday, we
24   should see that.
25       MR. SWOR:  Yes, sir.

```
 1              THE COURT:  So I'm just going to defer consideration

 2   on that, unless anybody wanted to comment further on it at this

 3   moment.

 4              From what you've seen so far, Ms. Mohsin, is there

 5   going to be a need for a reply, do you think or?

 6              MS. MOHSIN:  We may want a quick reply, Judge.  There

 7   -- based on, at least what I preliminarily read from Mr.

 8   Weiss's motion, I think there may be some.

 9              THE COURT:  Okay.  I'll wait for a few days, let's

10   say.  Certainly not earlier than the end of the week before

11   considering these things, but try to get a resolution out to

12   you reasonably soon.

13              The effect of your motion, the central impact of the

14   motion for protective order is to restrain, I think, to

15   restrain dissemination of discovery materials?

16              MS. MOHSIN:  Yes.

17              THE COURT:  Beyond counsel, client, intimates within,

18   within defense counsels' offices and so forth.  Is that --

19              MS. MOHSIN:  That's correct.

20              THE COURT:  Okay.  So we'll see what the responses

21   look like and what the profile is.  And I'll decide those as

22   rapidly as possible.

23              In terms of the form and cost of discovery then, which

24   is point B, the digital format predicted by the Government I

25   think corresponds to what you, Mr. Swor, and some other, Ms.
```

```
 1   Raben indicated in response that these should be OCR

 2   programmed, searchable, indexable and so forth.

 3        And Mr. Swor suggested in a supplementary comment that

 4   uniform Bates numbering should apply to everything, basically,

 5   starting with 001 and extending up to infinity, I suppose.

 6        MR. SWOR:  That would be the --

 7        MS. RABEN:  Likely.

 8        MR. SWOR:  The concern is, is that when they change

 9   the Bates numbering, either by witness or by institution or by

10   some other thing, it renders them -- it renders the process

11   more complicated.

12        THE COURT:  It requires more than one search.

13        MR. SWOR:  Yeah.

14        THE COURT:  If a search is going to be conducted.

15        MR. SWOR:  Yeah.  And then where they become one --

16        THE COURT:  By sub-folders and so forth.

17        If there were, however, if there were three -- I don't

18   know.  Maybe the Government agrees with your point.  Maybe I

19   should hear that first, rather than speculating.

20        What's your operational reaction to that, in terms of

21   starting with one and extending upwards as far as you need to

22   go?

23        MR. STRAUS:  Well, I think -- and, Saima, you probably

24   know better than I do in terms of the Bates.  But our initial

25   reaction to the request for OCR'ing -- and we're exploring this
```

1    right now.  You know, in the past we turned over stuff in hard

2    copy.  And this time, I think there will be people, probably

3    some of the more seasoned attorneys will probably end up

4    printing it, the digital off and reading it hard copy, as I do.

5    But the only concerns we have in terms of the OCR'ing is

6    whether or not that should even be our obligation.

7            And in talking with people who know a heck of lot more

8    than I do about this process, there are some compatibility

9    issues, Judge.  In terms of when one OCR's something, it

10   creates what I understand to be a text document that is not --

11   that is imperfect in sense -- in the sense of its ability to

12   search the entirety of the -- in other words, if the word "Fat

13   Dog" was to be searched, there may be an 80, 90, 95 percent

14   chance that all of "Fat Dog" will be picked up on that.  That's

15   point number one.  Number two --

16           THE COURT:  It depends on the quality of the document

17   that's being run through the scanner.

18           MR. STRAUS:  Exactly.

19           THE COURT:  And run through the program.  The program

20   will have a misinterpretation --

21           MR. STRAUS:  Right.

22           THE COURT:  -- percentage of some, to some degree.  If

23   it's a really clean copy of whatever is being scanned...

24           MR. STRAUS:  Right.  And we have handwritten materials

25   in this case as well.

STATUS CONFERENCE - 9/24/2012

1          THE COURT:  That's not susceptible to OCR --

2          MR. STRAUS:  Right.

3          THE COURT:  -- interpretation.

4          MR. STRAUS:  That's true.

5          THE COURT:  But the printed materials, as a general

6     proposition are.

7          MR. STRAUS:  Exactly.  Then I understand, from what I

8     understand, depending on what the OCR -- depending on what

9     software defense counsel are using to search it, I think

10    there's, there's a compatibility issue with the way we -- in

11    other words, I think there's at least, there's multiple OCR

12    tools that can be used.  For instance, there's Adobe, there is

13    IPRO, others, and there's some capability issues with that.

14         I don't know if that's -- and we'd like to talk about

15    that and respond to the Court on that.  But whether or not

16    that's something we should be doing and creating, being party

17    to potential shortcuts in terms of discovery obligations on

18    defense counsel, whether or not that's something that each

19    counsel should decide on, how they want to do it.  And but --

20         THE COURT:  I don't think I want 41 different

21    decisions on this.

22         MR. STRAUS:  Okay.

23         THE COURT:  You don't want to be put to the task of

24    doing things 41 different ways.

25         MR. STRAUS:  No, I know.  And that's, that's why --

 1              THE COURT:  Or do I have the right number?  Is it 43?

 2              MR. STRAUS:  It's 41.

 3              THE COURT:  Okay.  Has anybody asked for the

 4     intercession or advice of the discovery coordinating officer at

 5     the Administrative Office?

 6              MR. SWOR:  I'm having that ongoing conversation.

 7              THE COURT:  With him or her?

 8              MR. SWOR:  With Mr. Ranz.

 9              THE COURT:  With Mr. Ranz.  All right.

10              MR. SWOR:  What I've suggested and what the Court

11     preliminarily considered has never been a problem before.  And

12     the Government has done it before.  And to say that they don't

13     want to take the responsibility, it's in their own best

14     practices write-up that the Government do it.  And you know...

15              THE COURT:  I don't have so much a problem with that,

16     as I'm wondering about the mechanical aspects of it.

17              MR. SWOR:  It has not, to my knowledge, it has not

18     been a problem.  We just finished one with thousands, tens of

19     thousands of pages.  We didn't have a problem.  Didn't have a

20     problem in the Highwaymen case, and that was 90 some

21     defendants.

22              MR. SATAWA:  There was not a single dispute over the

23     digital form of discovery in Hutaree, not a single one.  And I

24     think of the 41 defendants, if I'm not mistaken, all but one or

25     two are represented by CJA counsel, and there were only one or

1    two retained lawyers.

2           And so the Government, if the Government doesn't do

3    it, if it gives it to us in the format that we have to do it,

4    then I think -- and I remember being at an electronic discovery

5    luncheon that your Honor was part of not too long ago in the

6    summer, a month or two ago, whenever it was, and this is

7    exactly what the U.S. Attorney's Office spoke on, that this

8    stuff would not occur.

9           And I think that rather than have 41 different lawyers

10   or 40 different lawyers bill CJA to put something into a format

11   when it can be done once and given to us, it just doesn't,

12   doesn't seem to make a lot of sense.

13          THE COURT:  I don't, I don't even know that's the

14   Government's thinking here or that they would suggest that

15   that's something that ought to be done.

16          What I sense is that Government counsel doesn't want

17   to be setting themselves up to be accused of something, you

18   know, not giving what should have been given or not -- you

19   know, hiding the ball or inadvertently suppressing statements

20   that should have been provided or something similar to that

21   because of a failure of software and so on.

22          So it seems to me that the mechanics of this, the

23   suitability particularly of the mechanics of this is, is the

24   thing to be debated, not whether it should be done.  It seems

25   to me that it should be done.  And that whatever -- and it's

1    from what I understand, this U.S. Attorney's Office has

2    employed the capability in other cases, earlier cases, and done

3    so with a fair degree of success.  I don't expect perfection.

4    If perfection was achieved in the Hutaree case, I'd be amazed.

5    Mr. Satawa indicates that there was --

6              MR. SATAWA:  We had no issues.

7              THE COURT:  At least there was no issue raised.

8              MR. SATAWA:  Yeah.

9              THE COURT:  But frankly, I think this is a process

10   that should be undertaken.  It should be done essentially

11   centrally, and that would be by the party that has possession

12   of the documents, Government counsel.  There needs to be an

13   appropriate length of time afforded for the mechanical process

14   to, to be undertaken.  And then either in waves or something

15   else, again, the mechanics of that we need to discuss and set

16   some standards and targets and expectations.

17             But so again, summing up, I'm not so concerned about

18   what, about what is to be done as the how it is to be

19   accomplished, how, when and so on.

20             And the product that comes out the other end is going

21   to be provided.  And if I hear defense counsel say, wait, this

22   is not perfect, this has problems, unlike Mr. Satawa's earlier

23   experience, I will be -- I will listen politely, but I'm not

24   going to be shocked.  And we'll just, whatever problems arise,

25   they'll have to be worked out by whatever, whatever the problem

1    may be, re-scanning, providing more in-depth or something.

2            Is the -- Mr. Swor, yeah.  Go ahead.

3            MR. SWOR:  I was going to say, I'd be surprised if it

4    isn't already OCR'd.  The practices of the Government in the

5    U.S. Attorney's Office, because they are using software that,

6    that requires an OCR database.

7            THE COURT:  Do you expect that the documentation would

8    be, the discovery, would be presented purely in an OCR format

9    or in that -- and in native original scanned, which is

10   essentially photographed format?  Do you have any, Government

11   counsel, do you have any experience?

12           MS. MOHSIN:  Well, first and foremost, Judge, I don't

13   have much experience with it.  I am learning as I go along

14   here.  And I think that perhaps in many cases which involve

15   bank records and sort of document-intensive cases, the OCR

16   reliability is somewhat increased because many of the documents

17   are already in a format that is easily readable.

18           I think in our case early on when we looked at this,

19   we were concerned about the margin of error with OCR, so we

20   didn't rely on it.  We've been doing this a little bit

21   differently perhaps than, you know, than others have.  So, no,

22   most of our stuff is not yet OCR'd.  So there is going to be

23   time before it is; that the way in which we've managed the

24   documents has not been.  I think ultimately, it would have to

25   go through some OCR process before it's transported into

1   another database, but that has not occurred.  We had

2   contemplated PDF's on disks.  Contemplated, again, one of our

3   thoughts was, okay, we've got 50 sets of search warrants.

4   Perhaps we take PDF's, put them on a disk and label it search

5   warrants.  We have, you know, this many subpoenaed records.  We

6   put it on a disk and label it subpoenaed records.  We have, you

7   know, sort of categories of discovery on disk in PDF native

8   format that counsel would then decide which they wanted to OCR,

9   which they didn't want to OCR.

10          Because my understanding is that if you put it in --

11  for instance, we use Adobe X.  If they use some other software,

12  whatever the software is that they have purchased and have a

13  license to use, they can then have it converted and

14  selectively.  Now, that was my preliminary understanding.

15          THE COURT:  Does anybody not use Adobe for, for

16  document writing?

17          MS. RABEN:  I don't know the answer to that.

18          MR. SWOR:  None of us are that smart.

19          MS. MOHSIN:  Well, there's different versions, too.

20          THE COURT:  Well, what are you doing talking about

21  OCR?

22          MR. SWOR:  No.  I meant, I meant using something other

23  than Adobe.

24          MS. MOHSIN:  But there's different types of Adobe,

25  Judge.  There's Adobe X and there's lesser, sort of lesser

```
 1    expensive versions of it.  So if you OCR in Adobe X and you

 2    look at it from another program, you may lose even additional

 3    data.  That's our understanding.  So that's when we began to

 4    think, well, wait a minute.  If we provide this OCR text format

 5    to defense counsel, and their software is not as sophisticated

 6    perhaps -- and I don't know that ours is necessarily even that

 7    sophisticated, but if it's less sophisticated, there may be

 8    more missing.

 9         And so we were concerned, exactly what the Court had

10    said earlier, about sort of, you know, we didn't provide this

11    information in a way that, you know, that they could digest.

12         THE COURT:  It seems to me that if the defense

13    uniformly requests OCR'd documentation, and you provide OCR'd

14    documentation, nobody is going to be heard to complain about

15    it.

16         MR. WEISS:  What, can I ask what format your potential

17    --

18         THE COURT:  This is Mr. Weiss, for the record.

19         MR. WEISS:  Your potential discovery materials are

20    currently?

21         MS. MOHSIN:  In PDF.

22         MR. SATAWA:  Well, your Honor, it seems to me --

23         THE COURT:  Mr. Satawa.

24         MR. SATAWA:  -- a relatively easy fix to tell us what

25    program we have to use.  I mean, if you're, if you're telling
```

STATUS CONFERENCE - 9/24/2012

1   us the technical requirements to use, if we're going to rely on

2   OCR, if the Government simply says buyer beware, if you're not

3   using Adobe X to review this in an OCR format, then you may not

4   get what we're getting out of it.

5          MS. MOHSIN:  Yeah.  I don't know that we can make that

6   representation.  I think the software company would have to --

7   I mean, I don't even know -- all I know is that differing

8   softwares has differing degrees of success.  I don't know

9   what's better or worse.  You may have a better one to begin

10  with.

11         THE COURT:  I'm going to circle back to what I asked

12  earlier, focusing on the individual whose identity I was

13  alerted to in the discussion with Mr. Ranz.  Mr. Ranz is now

14  the Sixth Circuit's budgeting coordinator for large scale

15  cases, death penalty cases, and cases of this kind included.

16         And he brought to everyone's attention the

17  availability of a discovery -- a national figure who is a

18  discovery coordinator.  I don't know any more about it than

19  that such a position is said to exist and is said to be tasked

20  with things that are at least related to this concept of

21  coordinating large, massive discovery projects and so forth.

22         Has anybody made any overtures to contact?  You said,

23  you began to say you were talking to Mr. Ranz with an aim to

24  get past Mr. Ranz to this discovery coordinator?

25         MR. SWOR:  We are discussing the feasibility of

STATUS CONFERENCE - 9/24/2012

1    using -- with 41 defendants, many of whom have conflicts, okay?

2    One of the problems is going to be using a single coordinator

3    and how they would create a sufficient firewall.

4           It's part of the budgeting process we're doing with

5    the investigator as well, is trying to identify and create

6    where the potential conflicts are and how the -- the long

7    answer is we're down the road on this.  We're not at square

8    one.

9           THE COURT:  Okay.  Give me -- help me with this.

10          MR. SWOR:  Yeah.

11          THE COURT:  Give me an example of how a

12    intra-defendant, no, inter-defendant conflict would be an issue

13    in the production and analysis of discovery materials.

14          MR. SWOR:  I'm assuming that the Government is not

15    going to give -- if any of the defendants have made statements.

16          THE COURT:  Proffers, for example.

17          MR. SWOR:  Proffers or anything else.

18          THE COURT:  Or confessions or whatever.

19          MR. SWOR:  That the Government is not going to make

20    those universally available.

21          THE COURT:  All right.

22          MR. SWOR:  But will make them available to their own

23    counsel.

24          THE COURT:  Okay.  Let's assume that.

25          MR. SWOR:  Okay.  So I want to be sure that if -- and

1    the discovery coordinator is an attorney.  And they propose

2    that they will be a 42nd attorney in this case, as it were.

3    And that all governmental conversations about discovery and the

4    dissemination of discovery will go through them.  And they will

5    facilitate the discovery going out to the respective counsel.

6              THE COURT:  Okay.

7              MR. SWOR:  I want to be certain that they have the

8    wherewithal and the firewalls in place that Mr., Mr. Jakuc said

9    his client testified in the grand jury.  God forbid his grand

10   jury testimony, or her grand jury testimony, gets disseminated

11   to other attorneys against whom that person testified when it's

12   not appropriate.

13             THE COURT:  Well, it wouldn't -- wouldn't that have

14   been forestalled by what you said at the outset, that is,

15   you're operating on a presumption that the Government is not

16   going to provide to anyone other than the individual defendant,

17   that defendant's proffer statement, that defendant's

18   confession, if there is one, that defendant's grand jury

19   testimony.  If you operate on that presumption, then those

20   materials would be culled from the mass of discovery.

21             MR. SWOR:  And that --

22             THE COURT:  Let's start, start with that assumption.

23   And tell me how -- what an inter-defendant conflict would look

24   like.  Why that would create a problem that you're --

25             MR. SWOR:  It's not.  It's one of the, one of the

STATUS CONFERENCE - 9/24/2012

1   discussions we've had is that, I mean, with this, this outfit

2   of former -- they're former Federal Defenders who have created

3   this organization.  So it's we're down that road and we're

4   trying to ascertain.  And quite frankly, I can't foresee many

5   more conflicts than that.

6             THE COURT:  That's why I asked you.

7             MR. SWOR:  Yeah.

8             THE COURT:  Okay.  So there probably -- so if we

9   operate on the presumption that I just laid out, then the

10  chance of a problem arising with the necessity of firewalls and

11  one thing or another, is greatly diminished, maybe goes away.

12  Yes?

13            MR. SWOR:  Yes.

14            THE COURT:  Okay.

15            MS. RABEN:  May I ask --

16            THE COURT:  And may I, may I assume from Government

17  counsel here, that my presumption is, is sensible, that you

18  would want to take pains to distribute to defendant, only to

19  defendant A, defendant A's grand jury testimony, if it exists;

20  his confession, if it exists; his proffer statements, if they

21  exist, right?

22            MS. MOHSIN:  That's correct, Judge.  In fact, we've

23  already begun that process.

24            THE COURT:  Okay.

25            MS. MOHSIN:  But I guess I'm a little confused about

STATUS CONFERENCE - 9/24/2012

1    what Mr. Swor has indicated.  I mean, is there a proposal that

2    we would turn our discovery over to one person who would then

3    disseminate it amongst?

4            MS. RABEN:  That's my question.

5            MS. MOHSIN:  Yeah.

6            THE COURT:  I'm not sure about the mechanics of that.

7    That is, that is tied up -- the answer to that question is all

8    tied up in this question about OCR or not, software systems,

9    disparate ways of looking at things and so forth, PDF versus

10   OCR.

11           All of those questions, it seems to me, can be, can be

12   addressed and probably rectified if we can make sensible use of

13   this, now I understand it's a group.  I thought it was somebody

14   that worked in the Administrative Office.

15           MR. SWOR:  There are three -- six lawyers in this

16   office.  They are not -- they are no more IT people than we

17   are.  Okay?  I was amused as we were talking, sitting here,

18   lawyers talking about compatibility issues and things like

19   that.

20           MS. RABEN:  It's not good.  Not good.

21           MR. SWOR:  Pretending that we actually know what we're

22   talking about.  But the fact is they are not IT people either.

23           THE COURT:  You are on the record, by the way, Mr.

24   Swor.

25           MR. SWOR:  Yes.

    1              (Laughter.)

    2              THE COURT:  Just, just as a reminder.

    3              MR. SWOR:  Yes.  And notice I said "we."  I didn't say

    4    "you."

    5              They are not, they are not going to be able to tell

    6    us, for example, you know, they are not going to inquire of the

    7    Government what formatting or what scanning.

    8              THE COURT:  Look, this is what I think about discovery

    9    issues, the mechanics of it, at least at the outset.  If there

   10    is a group of attorneys, former Federal Defenders that has been

   11    organized to assist in the receipt and distribution and

   12    organization of massive amounts of discovery in multiple

   13    defendant cases, I think we should give it a chance and see if,

   14    whatever their degree of technical knowledge may be, I think

   15    that we ought to be seeking their assistance, first and

   16    foremost.  And that would be before the Government starts

   17    copying and OCR'ing massive, you know, tens of thousands of

   18    pages, on the assumption that there are that number of

   19    documents.

   20              MR. WEISS:  Your Honor, how does the Court propose --

   21    Art Weiss.  How does the Court propose dealing with potential

   22    *Bruton* issues if the Government is only initially going to

   23    provide a particular defendant with his or her statement,

   24    confession, grand jury, and so forth?  How will we know?

   25              THE COURT:  It's a trial issue, isn't it, almost

STATUS CONFERENCE - 9/24/2012

1   exclusively?

2          MR. WEISS:  Well, a trial in the, in the ultimate

3   sense, yes.  But the problem is, if counsel knows or has an

4   inkling that their client may have a problem with someone else

5   in their group, or in the indictment as a whole, I don't think

6   it should be left solely to that attorney.

7          I mean, the other attorney should have some idea of

8   who it is they can rely upon, who it is that they can talk to,

9   commiserate with and what have you.  And I don't think we

10  should leave it solely for another two years down the road

11  when, you know, we have made strategies or engaged in

12  conversations, and we have no knowledge of that potentiality.

13         THE COURT:  Well, I think, I think a couple of things

14  about that.  Number one, first and foremost, it is, the *Bruton*

15  issue presents a trial, a trial problem under Supreme Court

16  precedent.  Secondly, it's a problem that haunts the

17  Government.

18         MR. STRAUS:  Exactly.

19         THE COURT:  Because it can upend prosecutions,

20  convictions and so on.

21         So my expectation is that in the grouping and in the

22  discussions that are forthcoming, that Government counsel will

23  have already been sensitive and will continue to be sensitive

24  to that issue, and will, my expectation, will be taking

25  sensible and good faith efforts to try to not give rise, to not

1   give rise to those sorts of problems as the case progresses.

2           Thirdly, you can ask your client.  It seems to me your

3   client is going to know more about that than almost anybody

4   else, and be guided accordingly.  I mean, I'm not telling you

5   anything that you don't -- you haven't already known for the

6   last 20 years.

7           But those three things in sequence tell me that, that

8   for the moment, not approaching trial, this is a bridge that we

9   can cross later.  So I don't see a problem that requires my

10  attention, first and foremost, now.  Maybe later, yes, but I

11  don't think so now.  That's my reaction.

12          MR. WEISS:  Well, to some extent then, we're going to

13  proceed at our own peril in terms of discussing with co-counsel

14  various aspects.  But I'm not going to quarrel with the Court.

15          The other side of the coin of my concern is many of us

16  are in more than one indictment.  And will the Government, on

17  its own or will the Court be requiring them to, when we do get

18  discovery, regardless of the format, of segregating it, and so

19  we know which potential items or reports or witness, or what

20  have you, go with which prosecution?  Are we going to be solely

21  left to surmise that?

22          THE COURT:  Well, I don't know that --

23          MR. STRAUS:  I don't think we were contemplating that.

24  But the simple answer is everything in the '066 indictment will

25  come in, arguably will come in as relevant conduct for the

1   RICO, because it's subsumed within the RICO.  So there's -- I

2   don't see the --

3          MR. WEISS:  Well, if you try the RICO case first, then

4   that becomes secondary.  But what happens if the '066 case is

5   tried first?  How, how do we, in representing one of those

6   individuals, know whether we're just dealing with certain items

7   or whether we're dealing with everything?  In other words, are

8   both cases going to be mirror images of the other?

9          MR. STRAUS:  Yeah.  I mean, we've alleged it.  We've

10  alleged basically the same defendants --

11         MR. WEISS:  Well, but I know --

12         MR. STRAUS:  With the exception of one.

13         MR. WEISS:  But do I understand you correctly, Eric,

14  that whatever is in 20129 case, if the '066 case goes first,

15  that everything from the RICO case is fair game for the '066

16  case?

17         MR. STRAUS:  No.

18         MR. WEISS:  That's what I'm getting at.  How are we

19  going to know what is going to be in the -- if the Court

20  decides, for example, without being presumptuous, your Honor,

21  that that case would be tried first, how would we know which

22  proofs out of this massive quantity that you're eventually

23  going to give us would be fair game in the '066 case?

24         MR. STRAUS:  I mean, I think that's a decision you're

25  going to have to make.  Because --

1          MR. WEISS:  We shouldn't have to guess.

2          MR. STRAUS:  -- there is additional obligations beyond

3     the Government proofs.  There will be issues as to your defense

4     that you may be in a better position to know in terms of *Brady*,

5     *Giglio*, those types of things.  We will provide you the

6     universe, but I don't know that we can -- we're going to be

7     able to break down that which is in the entirety of the

8     universe.

9          MR. WEISS:  Well, but if you indicted them separately,

10    then you should have an idea of what the proofs are for the

11    '066 case and what the proofs are for the '129 case.

12         THE COURT:  Some of this is going to be resolved and

13    more finely sliced as trial time approaches.  There will be

14    such things as witness lists, I suspect, that will be provided

15    in the ordinary course --

16         MR. STRAUS:  Right.

17         THE COURT:  -- of business.  There will be Rule 16

18    disclosures and probably refinements of, of such disclosures as

19    we move down the road.  And I think that the practical concerns

20    that Mr. Weiss expresses here are fairly likely to be

21    diminished as the case progresses.

22         I don't think that we can expect a fully formed,

23    highly compartmentalized picture of what the trial would

24    inevitably look like on the '066 indictment.  Things change.

25    Sometimes they change during trial, as a matter of fact.

STATUS CONFERENCE - 9/24/2012

1  Sometimes some witnesses are brought in that weren't originally

2  contemplated.  Other documents are implicated by testimony that

3  may have been unexpected.  So there's a certain degree of

4  fluidity here that's natural in the processing of these cases,

5  it seems to me.  So it's not, by any means, an irrational

6  concern.  The desire for some certainty is understandable.  But

7  I don't think that it -- it's not the kind of thing that I'm

8  going to step into and direct that that certainly be nailed

9  down at this very, very early stage.

10         Did you raise your hand, Mr. Swor, about to chime in

11  on this, or did I?

12         MR. SWOR:  Not on this.

13         THE COURT:  Mr. Satawa did, perhaps.

14         MR. SATAWA:  Mark Satawa.

15         Judge, I share Mr. Weiss's concerns.  I understand

16  them.  And I guess to the extent we're here trying to come up

17  with a map, a road map for how this case is going to proceed,

18  perhaps one of the concerns that the Court could include would

19  be the determination of which case is going to be tried, not

20  necessarily the defendants in the larger case, in the '129

21  case, but are we going to try the '129 case first?  Are we

22  going to try the '066 case first?

23         I mean, I don't know that it's unreasonable to have

24  that, at least, on the list of action items to resolve.

25  Because otherwise, as Mr. Weiss said, if we end up trying the

STATUS CONFERENCE - 9/24/2012

```
 1    '066 case first, we're going to get the universe of discovery,
 2    as Mr. Straus says, which on some level is going to include
 3    thousands of pages of documents that are not relevant to that
 4    case.
 5              THE COURT:  Well, the '129 case is the oldest, right?
 6              MS. MOHSIN:  The '066 case is older.
 7              THE COURT:  It is?
 8              MS. MOHSIN:  It was indicted under seal.
 9              CASE MANAGER:  The '129 was unsealed first.
10              THE COURT:  Okay.  Well, the number 20129 comes before
11    29966, both in 2011.  The '129 case was --
12              MR. WEISS:  No.
13              MS. RABEN:  Your Honor, the Jeff Smith case, I think,
14    is 20066.
15              THE COURT:  Oh, is it?
16              MR. WEISS:  Yes.
17              THE COURT:  It reads group -- I just happened to be
18    looking at Group 1's reaction to the Government's Memorandum of
19    Case Management, and it's listed as 299.
20              MR. SWOR:  The OCR failed.
21              THE CLERK:  This is ours.
22              THE COURT:  This is ours.  Oh, okay.  I'll look at
23    ours.  20066.  Yes, that is the earlier.
24              The OCR failed, is that what you said, Mr. Swor?
25              MR. SWOR:  Yes.
```

STATUS CONFERENCE - 9/24/2012

```
 1             (Laughter.)

 2             THE COURT:  Okay.  20066.  Okay.  So, yeah, the Smith

 3   case is the, is the eldest.  Oldest.  And that is the -- what

 4   is that?  What's the core of that case?

 5             MR. SABBOTA:  Subornation of perjury, Judge.

 6             THE COURT:  Subornation of perjury in the --

 7             MR. WEISS:  Witness tampering.

 8             THE COURT:  -- such and such case?

 9             MS. MOHSIN:  In the trial before Judge Zatkoff, Judge,

10   there were --

11             THE COURT:  In Port Huron.

12             MS. MOHSIN:  Correct.

13             THE COURT:  The defendant being not Smith.  Was it

14   Smith?

15             MR. STRAUS:  Vic Castano.

16             THE COURT:  Castano.  Okay.

17             And then the essence of the, of the '387 case, Villa,

18   et al, the core of that is?

19             MS. MOHSIN:  The Villa case is just a felon in

20   possession of a firearm case.  It's a one-count case.

21             THE COURT:  Okay.

22             MS. MOHSIN:  Judge, if I may?

23             THE COURT:  Yes.

24             MS. MOHSIN:  It's entirely possible that we move to

25   join some of these cases for trial purposes, particularly in
```

 1   light of the fact that there are overwhelming, I'm sorry,

 2   overlapping proofs in one.

 3            THE COURT:  Villa, who has -- what defendant?

 4            MS. MOHSIN:  Which attorney?

 5            THE COURT:  Yeah.  Who has --

 6            MS. MOHSIN:  Mr. Morgan.

 7            MR. STRAUS:  Mr. Morgan.

 8            MS. MOHSIN:  Richard Morgan.

 9            THE COURT:  Okay.  And it's a one-count.  And Villa is

10   charged in the RICO?

11            MS. MOHSIN:  Yes.  Not with RICO, but in the RICO.

12            THE COURT:  Okay.  Is he the only defendant in the

13   '129 that's not charged in the RICO?

14            MS. MOHSIN:  There are --

15            MS. RABEN:  No.

16            MS. MOHSIN:  -- eighteen.

17            MS. RABEN:  The answer to that is no.

18            THE COURT:  There are some of the 40, some in '129 who

19   some are charged in the RICO, some are not.  So they are

20   sprinkled out amongst the other either conspiracy or

21   substantive counts, yes?

22            MS. MOHSIN:  Yes.

23            THE COURT:  Okay.  So if Villa were consolidated into

24   the '129, if that were sought and if it were agreed to or

25   ordered, he would just, he would simply be one more defendant

```
 1   who was facing a substantive count.  Is that what you're
 2   thinking?
 3             MS. MOHSIN:  Yes, Judge.
 4             MR. STRAUS:  He would be a pre-existing defendant
 5   that's facing another count.
 6             MS. RABEN:  He's already in '129.
 7             THE COURT:  He is.
 8             MR. STRAUS:  And we could probably create, for trial
 9   purposes, a "redacted indictment" that just added another count
10   at the end.
11             But Ms. Mohsin can correct me if I'm wrong, and this
12   might address Mr. Weiss's concern.  It strikes me that, one,
13   the trial issue obviously is something down the road.  But I
14   think all the '066 defendants are all RICO defendants, correct?
15             MR. WEISS:  And they seem to be charged with the same
16   conduct.
17             MR. STRAUS:  Yeah.  So I mean, that would be an issue
18   depending how that fleshes out, who, who are the last men
19   standing, whether or not that would be an efficient use of the
20   court's resources to try that universe, or a much smaller
21   universe of the jointly charged '066 defendants and '129 ones.
22   Because I think there are -- I think --
23             MS. MOHSIN:  Nearly all, not all, but nearly all.
24             MR. STRAUS:  Nearly all, but --
25             THE COURT:  Are you suggesting it would be inefficient
```

STATUS CONFERENCE - 9/24/2012                35

 1    to try the '066 case first?  Is that the inclination?

 2           MR. STRAUS:  Well, yeah.

 3           THE COURT:  Or less efficient?

 4           MR. STRAUS:  I think the way we've been -- the way

 5    we've charged the '129, which subsumes the conduct in the '066,

 6    we would essentially, if we were to be trying those defendants,

 7    we would be trying the same case twice, one of the cases being

 8    '066 plus other racketeering events to flesh out the remainder

 9    of the RICO.

10           So if there is a smaller, workable universe of

11    defendants left on one -- '066 and '129, that would be an issue

12    for the Court to decide whether or not, hey, let's try both

13    these indictments at the same time because we're going to be

14    putting that same proof in, both for the substantive conspiracy

15    to suborn perjury, obstruction of justice, and as part of the

16    racketeering acts.  And I think it's also as part of the manner

17    and means of the RICO as well.  So it can't really be divorced.

18           THE COURT:  So if all three of these indictments were,

19    in essence, tried simultaneously, one jury, one trial process

20    and so forth, it would mitigate Mister -- it might raise other

21    concerns, but it would mitigate the precise concern that Mr.

22    Weiss was talking about.

23           MR. WEISS:  Well, in terms of discovery, perhaps.  May

24    I also inquire, if that's the case, is there a real

25    governmental necessity to maintain '066?

 1            THE COURT:  In other words, could it be folded in?
 2   Could the charge be folded?
 3            MR. WEISS:  I mean, if everything is going to be in
 4   '129, isn't having '066 just piling on?
 5            MR. STRAUS:  There's no such thing as piling on.
 6            THE COURT:  Well, it's --
 7            MR. WEISS:  That was definitely Mr. Straus.
 8            MR. STRAUS:  Yeah, that was definitely Mr. Straus.
 9            THE COURT:  It seems to me that, that it would make, I
10   think that it would make sense to consider, as we move down the
11   road, the utility of folding all of these things in for trial
12   purposes if, as I'm understanding now, they are almost
13   indistinguishable in terms of the operative facts that support,
14   and especially '129 and '066.  '387 hanging out there as one
15   FIP is kind of, I don't know, it's a little foolish to try that
16   as an independent, stand-alone trial.
17            Mr. Smiley's attorney may think differently, or Mr.
18   Villa's attorney may think differently.  And we're not going
19   to, certainly not going to do anything without, without his
20   input of course.
21            So what does all this tell us about discovery we need
22   and the track?  I want some further information about this,
23   your discussion, Mr. Swor, as it moves, as you say, down the
24   road a piece and so forth.  We need to get down closer to the
25   end of the road in terms of some decisions as to how this group

STATUS CONFERENCE - 9/24/2012                                    37

1    may be able to assist in the mechanics of receiving,

2    delivering, possibly organizing, subdividing and otherwise, the

3    mass of discovery that's implicated here.

4            MR. SWOR:  The question I have been repeatedly asked

5    by both Bob Ranz and by Kelly Scribner out in California, is

6    how much discovery is there.  What, what is it?  You know, is

7    it all search, you know, so.

8            THE COURT:  Let me, let me turn that to the

9    Government.

10           Is it possible to provide a master list that at least

11   approximates the nature and volume of the discovery that you

12   intend to distribute, as you understand the situation now?

13   What quantity of search warrants do we have, search warrants

14   and affidavits and returns?  302s, I guess, investigative 302s?

15   What other categories would there be?  State investigative

16   records, court documents, transcript, transcript testimony, not

17   grand jury, just maybe earlier trials or something of that

18   sort.

19           MS. MOHSIN:  To some extent we can, Judge, do exact --

20   we can provide that approximation with some sort of an index.

21   We have already sort of had some discussions about the, the

22   sort of categories, if you will, of discovery that, that we

23   have.  So to some extent, we can provide that, estimates about

24   the numbers.

25           THE COURT:  What do you think it would look like?

 1          MS. MOHSIN:  Anywhere from 10 to 15,000 documents.
 2   There's a separate issue about audio calls and the wiretaps,
 3   which I think are, I think nine months of wiretap calls, which
 4   I think is a separate issue.
 5          THE COURT:  But you know how many of them.  They are
 6   quantified, right?
 7          MS. MOHSIN:  The calls themselves?
 8          THE COURT:  Yes.
 9          MS. MOHSIN:  They can be quantified.  I haven't
10   actually sat down and done it.  But as far as providing the
11   entire wire as part of our obligations in discovery, that's
12   eight months worth of, or rather nine months worth of calls.
13          THE COURT:  And it's a certain number of hours?
14          MS. MOHSIN:  Yes.  Yes.  I mean, just by way of
15   interjection, we wanted to have a separate discussion about the
16   wire calls themselves.  Because in other cases that I've worked
17   on that have had multiple wiretaps not, not a month or, you
18   know, 30 days so to speak, because of the volume, I don't know
19   that it would be practical or possible for us to, you know, if
20   we were to burn them to individual disks, I don't know how many
21   disks they would take up because they are audio files.  So --
22          MR. SATAWA:  Have they been transcribed?
23          MS. MOHSIN:  Well, the transcriptions are not going to
24   be provided at this point, but we are going to give you
25   guidance as to which calls that you're going to want to listen

1    to based upon the different soft of predicate acts.

2              MR. STRAUS:  Get the logs.

3              MS. RABEN:  What about line notes?

4              MS. MOHSIN:  We don't have line notes.  The agents did

5    not do line notes in this case.  But we have information about

6    the, about the call that's available.

7              MS. RABEN:  How many calls do you think there are,

8    Saima?

9              MS. MOHSIN:  That we are going to play?

10             MS. RABEN:  No.

11             MR. SATAWA:  Total.

12             MS. RABEN:  Total.  I mean, 27,000?  50,000?  A

13   hundred thousand?

14             MS. MOHSIN:  I don't know the number right now.

15             MS. RABEN:  Okay.

16             MS. MOHSIN:  I couldn't give you a number.

17             MR. DICKSTEIN:  One alternative to CDs might be --

18             MR. SABBOTA:  How about --

19             MR. DICKSTEIN:  -- I have a case --

20             MS. MOHSIN:  Can I --

21             THE COURT:  Excuse me.

22             MR. DICKSTEIN:  Sorry.

23             THE COURT:  Let's all remember we're on the record.

24   Let's identify ourselves, particularly if you haven't spoken

25   before.

 1           MR. SABBOTA:  Jerome Sabbota on behalf of Mr. Smith.
 2   How about hours?  How many hours do you think?
 3           MS. MOHSIN:  I can't give you that number.  I haven't
 4   tabulated it to tell you how many hours of calls.  I can tell
 5   you that there were wire intercepts over a nine month period of
 6   time.
 7           THE COURT:  Mr. Dickstein?
 8           MR. DICKSTEIN:  Yes, your Honor.  Loren Dickstein on
 9   behalf of Group 2.
10           One alternative might be, I have another case where
11   the discovery is voluminous, we provided a terabyte hard drive.
12           MS. MOHSIN:  Well, that's what I was about to say, I
13   was trying to say, is that what one of the thoughts was if you
14   would provide, or if you could provide us with a hard drive, we
15   can have all those calls put onto the hard drive and embedded
16   in them is certain information about the date and the time of
17   the call and the number of the call.
18           You know, one of the things that we've talked about
19   providing is maybe some guidance as to these are the calls that
20   are relevant that you're going to want to listen to, at least
21   that we're relying on in part, so that you can, you can listen
22   to -- you can at least be aware of those calls.  I've done that
23   in other cases.
24           But I can't imagine trying to put them all on disk.  I
25   think that would be unwieldy.  But it's going to be a cost

1   issue.  I think it's like a hundred dollars a drive.  So that

2   was one of the issues.  I don't, you know, I don't know that

3   it's practical to put them on CDs.  Of course, if that's what

4   the Court ordered and what the parties would want, then we

5   would do that, but...

6               MR. WEISS:  Do your logs identify who the participants

7   are, and is that easily accessible?

8               MS. MOHSIN:  No.  It's not easily accessible in the

9   call itself.

10              MR. WEISS:  But have you created a log or a list of --

11              MS. MOHSIN:  No.

12              MR. WEISS:  -- your calls and by --

13              MS. MOHSIN:  We're not providing transcripts at this

14  time, because transcripts are not in any sort of final format.

15              MR. WEISS:  I'm not asking --

16              MS. MOHSIN:  And that information would be embedded

17  within the transcript.

18              MR. WEISS:  I guess what I'm asking is the follow-up

19  on what Margaret was saying, is if you've got 10, 20, 50,000

20  calls, is there any way for us to sort of zero in on the calls

21  that our respective clients are alleged to have participated

22  in, rather than just hit and miss, going through the 40,

23  50,000, whatever number of calls there are?

24              (Ms. Mohsin conferring with Mr. Straus.)

25              MR. WEISS:  No.  Even without the transcript, wouldn't

 1    the log --

 2          MS. MOHSIN:  I don't have a log.  I can't tell you

 3    that I have a log.  What I have is sort of -- it would have to

 4    be created.  And I don't know that we could create something

 5    like that.

 6          MR. WEISS:  Well, when the agents were listening in

 7    and maintaining the Title III and the minimization and all of

 8    that, at least my experience is they sort of jot down who they

 9    think the participants are.

10          MS. MOHSIN:  No, that information is preserved, but

11    it's preserved in a format that I'm not sure how I'm going to

12    get that sort of --

13          MR. WEISS:  Okay.

14          MS. MOHSIN:  Yeah.  That information is preserved.  I

15    would have to have a little more discussion about that issue.

16    But I understand what you're, what you're requesting.

17          MR. WEISS:  Yeah.  All right.

18          MS. MOHSIN:  Yeah.

19          MR. WEISS:  Thanks.

20          THE COURT:  Fewer than a hundred percent of the

21    defendants are, are captured in wiretaps, I would imagine?

22          MS. MOHSIN:  Correct.

23          THE COURT:  The statements made, however, are

24    ordinarily argued to be admissible against all, to the extent

25    that there's a conspiracy or a RICO liability being pressed,

1      right?

2            MS. MOHSIN:  Yes.

3            THE COURT:  Ms. Raben?

4            MS. RABEN:  And people who were not participants in

5      the calls may well be discussed within calls.  So there needs

6      to be some way to search this universe.  Otherwise, we're all

7      going to be sitting there listening.

8            MR. SATAWA:  And Mr. Ranz even discussed this at that

9      initial meeting in front of your Honor.  Mark Satawa.

10           I mean, to some extent, if it might, you know,

11     considering there's whatever, 24 hours in a day, 7 days in a

12     week, and 52 weeks in a year, it may be physically impossible

13     to listen to the amount of calls that they have in a set period

14     of time.  I mean, I think that that is the concern that we all

15     have.

16           THE COURT:  Any comments?

17           MR. STRAUS:  I mean, I think some of the -- obviously,

18     on the eve of trial -- Eric Straus on behalf of the United

19     States -- we'll be providing an exhibit list with those calls

20     we seek to introduce.  But I don't know that we can, I guess,

21     do a functional equivalent of an OCR on the audio recordings.

22           But I will say that because there's at least three

23     major conspiracies charged within these two indictments, even

24     people who are not mentioned will be chargeable with the

25     conduct of others.

1              MS. RABEN:  Oh, I agree.

2              MR. STRAUS:  Beyond.  And so --

3              MS. RABEN:  That's the problem.

4              MR. WEISS:  Well, it depends on the nature of the

5     call.

6              MR. STRAUS:  Yeah.

7              MR. WEISS:  I mean, there could be some calls that

8     don't further the conspiracy.

9              MR. STRAUS:  And it could just be testimony of

10    witnesses that these people were part of the conspiracy, and

11    there was no discussions about that person, and there are no

12    captured conversations involving that person, so.  But I don't

13    know how --

14             MR. WEISS:  You know, that's an interesting esoteric

15    question.  Do you anticipate charging these three separate

16    conspiracies at the same, or trying them at the same time?

17             MR. STRAUS:  It could very well be, because for

18    instance, the meth conspiracy, which I think is Count 3 is

19    charged as racketeering activity in the RICO count, in the '129

20    indictment.

21             MR. WEISS:  Well, what happens if there was a call or

22    a series of calls that may have been made during the course of

23    the meth conspiracy that don't further the meth conspiracy, and

24    may be simply admissible against the declarants or the

25    participants of the call?  Would your argument then be that

```
 1    they may not be admissible against the other --
 2              MR. STRAUS:  I think those are trial issues.
 3              THE COURT:  Yeah.
 4              MR. WEISS:  But it will lead to some type of motion.
 5    And I don't know whether the Court anticipates allowing motions
 6    to be brought up during the course of trial dealing with the
 7    Title III.  If we're not going to get a lot of this identifying
 8    information until close to the eve of trial, it may be past the
 9    Court's motion cut-off deadline.
10              THE COURT:  If it becomes necessary in order to
11    preserve a defendant's rights under the circumstances,
12    complications like that, it seems to me, can lead to motion
13    practice, then or earlier.  However, your first recourse is to
14    try to arrive at a sensible resolution by agreement among
15    counsel before bringing them to the Court.
16              MS. RABEN:  Margaret Raben, Christin.
17              These are Title III wiretaps, right?
18              MS. MOHSIN:  Yes.
19              MS. RABEN:  I mean, the agents are keeping some sort
20    of data about these calls because they have a duty to minimize
21    calls that are not relevant.  So there is, there is some kind
22    of data being kept that identifies --
23              MR. STRAUS:  Minimize, not --
24              MS. RABEN:  -- whose phone.
25              MS. MOHSIN:  Yes.
```

1          MS. RABEN:  And who the speakers are.  So there's
2     something here that can be used to help identify what these
3     calls are.

4          MS. MOHSIN:  Yes.

5          THE COURT:  That's common, as you say, it's common.
6     Government counsel understands that it's commonly or regularly
7     kept.  So that may -- perhaps that will assist in, in the
8     identification of these tapes, which Ms. Mohsin already said
9     she expects to give you guidance, to give the relevant
10    attorneys guidance as to you're probably going to want to
11    listen to approximately here on tape, or conversation number 52
12    or whatever the case may be.

13         Back to Mr. Swor.  And I'm hoping I can get some sort
14    of report on the utility of these things.  Is it possible that
15    you could perhaps synthesize your conversations and file a
16    report as to what utility this group, this discovery group
17    might be in this case?

18         MR. SWOR:  I think it would be *ex parte*, but --

19         THE COURT:  Fine.  You could lodge it with the Court
20    *ex parte*.

21         MR. SWOR:  Yeah.

22         THE COURT:  Just give me an understanding.

23         MR. SWOR:  But I still need -- I mean, so we're told
24    that the universe is nine months of wiretaps of we don't -- was
25    this wiretap running for nine months, every day?

STATUS CONFERENCE - 9/24/2012

 1          MS. MOHSIN:  There are two different wiretaps.

 2          MR. SWOR:  Okay.

 3          MS. MOHSIN:  And I hope I'm not wrong and confusing it

 4    with another case.

 5          MR. SWOR:  No, no.  I just want some idea.

 6          MS. MOHSIN:  So I want to say it's nine months.  I

 7    have to look at my -- the wires.

 8          MR. SWOR:  Okay.

 9          MS. MOHSIN:  One wiretap was of Paul Darrah's phone.

10    And that one was, I believe, that was the one that was six

11    months or seven months in length.  And then one was of Vern

12    Rich's phone, and that was two months in duration.  So there

13    are two separate wiretaps.

14          MR. SWOR:  Okay.  They are continuously running, is

15    what you're saying?

16          MS. MOHSIN:  No.  I'm not saying that.  The Vern Rich

17    one was continuous, and I want to say the Paul Darrah one was

18    after a period of time.  And that one, I believe, did not have

19    interruption, if I'm not mistaken.

20          MR. SWOR:  Okay.  So that gives me some kind of idea.

21          One of the problems is the availability of the folks

22    out west --

23          THE COURT:  A point to be --

24          MR. SWOR:  To do that.

25          THE COURT:  A point to be discussed.

1          MR. SWOR:  And the other thing is, is we actually have

2     local people.  And I've already talked to Mr. Gleeson about

3     Miller Canfield has a, a unit in their office that does

4     discovery.  We've had, we had local counsel in the Hutaree case

5     help us.  So I will provide to you the universe of information

6     in an update.

7          THE COURT:  It would be particularly helpful if what

8     you could provide me is a recommended resolution.

9          MR. SWOR:  Yes.  Yes.

10          THE COURT:  Okay.  Good.

11          MR. SATAWA:  Mr. Ranz even suggested possibly having

12     two local lawyers be brought into the case.

13          MR. SWOR:  Well, we've talked about that, too.  So

14     yes.

15          THE COURT:  All right.  I'd be very interested in

16     suggested, suggested problem resolution in that regard.  And

17     then whatever budgetary implication it has, whatever approval,

18     whatever string of approvals might be required, justification.

19          MR. SWOR:  Yes.

20          THE COURT:  Suggested sign-offs and so forth.  Right?

21          MR. SWOR:  Yes.

22          THE COURT:  Okay.  When?

23          MR. SWOR:  Bob has been out of the office.  I'll try

24     to have it by the end of the week, by the beginning of next

25     week.

```
 1              THE COURT:  That would be marvelous.  Why don't I say
 2    Wednesday of next week, we'll expect --
 3              MR. SWOR:  That will be great.  So ten days.
 4              THE COURT:  Roughly ten days.
 5              MR. SWOR:  Okay.
 6              THE COURT:  This is, what is this?  Monday.
 7              THE CLERK:  That would be October 3rd.
 8              THE COURT:  October 3rd.  Let's set a target date, Mr.
 9    Swor, that you could have a set of suggested discovery
10    resolutions that you, that you believe in good faith would be
11    suitable, having run it past the other liaison counsel for
12    their groups that is designed, a resolution designed to
13    streamline and to minimize disruption in the acquisition and
14    distribution of discovery materials, including wiretap, a means
15    by which defense -- defendants can provide hard drives for
16    recording of the mirroring, essentially, of the hard drive on
17    which the wiretap information is stored.
18              MR. SWOR:  I was --
19              THE COURT:  You might even want to consider that
20    group, Miller Canfield or otherwise, may want to consider
21    whether it would be a good idea to make a kind of a mass
22    purchase of the same hard drives.
23              MR. SWOR:  I've already --
24              THE COURT:  One for everybody.  You're already
25    thinking about that?
```

 1              MR. SWOR:  Because now, now that we're told it's at

 2    least a terabyte and that there's hard drives, if we've done

 3    that in other cases, and I have arranged bulk purchases of, so

 4    if they needed a two-terabyte or one-terabyte.  And I've also

 5    done, just so you know, I've done some exploration of the

 6    feasibility of using cloud access, and one of the IT people

 7    that we're using in the Norwood case in Flint, creating

 8    firewalls.  And so we are working with them.

 9              THE COURT:  Okay.  Good.

10              Do you, do you think by a similar date, by next week

11    Wednesday, you could have drafted for the Government, Ms.

12    Mohsin, a kind of outline of at least approximating what, what

13    is out there for distribution and in what sort of categories

14    roughly the amount of volume involved, the sort of information,

15    and so on, as we discussed?

16              MS. MOHSIN:  Certainly.

17              THE COURT:  And that -- is there any reason not to

18    file that, or just -- no reason not to file that, I suppose.

19    It's not going to have any particular identification on it.

20              So let's ask you to file that, Mr. Swor's report by

21    the same date, October 3rd.  I don't expect it to be filed, but

22    lodged with the Court.

23              CASE MANAGER:  Can they e-mail it to me?

24              THE COURT:  Oh, you can e-mail it.  Mr. Swor, if you

25    would e-mail it then to my case manager, Lisa Wagner.

STATUS CONFERENCE - 9/24/2012

1           MR. SWOR:  Yes.  That would be good.

2           MR. SATAWA:  Your Honor, may I ask a question?

3           THE COURT:  Mr. Satawa.

4           MR. SATAWA:  Is the report the Government is going to

5    provide is Rule 16 discovery only?  It's not going to talk

6    about *Jencks*, it's not going to be anything that's going to be

7    way further down the line?  We're talking Rule 16 discovery

8    only?

9           THE COURT:  That was my concept.

10          MS. MOHSIN:  What we're prepared to, yeah, that's

11   right.

12          MR. SATAWA:  I just want to make sure that --

13          THE COURT:  Because there's more out there in terms of

14   grand -- there's a ton of grand jury, I'm sure.

15          MR. SATAWA:  Oh, sure.

16          THE COURT:  That's not comprehended in this.

17          Okay.  Yes, Mr. Swor, one other thing?

18          MR. SWOR:  May I inquire whether the 10 to 15,000

19   documents and the wiretaps are, so far, kind of describe the

20   universe of the discovery?  Or is there going to be other --

21          MS. MOHSIN:  Including *Jencks* and Rule 16?

22          MR. SWOR:  No, excluding *Jencks* and Rule 16.  I mean,

23   are there other, other things that you're going to provide in

24   discovery?  Are we going to have videos?

25          MS. MOHSIN:  I want, I want to say that that's

STATUS CONFERENCE - 9/24/2012

 1      basically the universe.

 2              MR. SWOR:  Okay.

 3              MS. MOHSIN:  Yeah.  And I want to say that the 15,000

 4      documents is probably going to be a number that incorporates

 5      most of the *Jencks* as well.

 6              I can't right now, as we sit here, think of perhaps

 7      there's some recordings and some other stuff that's not part of

 8      that.  But, but sort of the, you know, the bulk is, is that.

 9              THE COURT:  Okay.  As well as it can be described, I

10      think it will be helpful to sort of get, allow defense counsel

11      to get their arms around mechanics of assisting and

12      distribution and so on.

13              Something else, Mr. Swor?

14              MR. SWOR:  A couple of lawyers have called me in our

15      group, have asked me about this.  Is there any reason that

16      those lawyers can't get their client statements now, their

17      client's grand jury testimony now?  Because that's not going to

18      be part -- it's not --

19              THE COURT:  Are you assuming that the protective order

20      has been entered?

21              MR. SWOR:  No.  But I, I wouldn't think --

22              THE COURT:  Let's operate on that presumption.

23      Operate on the presumption that the protective order, as

24      sought, or something similar to it, has been entered.  And your

25      question is?

```
1              MR. SWOR:  Regardless of whether there is a protective

2     order, a lawyer, Mr. Jakuc, wants his client's grand jury

3     testimony, his client's debriefings.  I don't think that

4     there's the same kind of risks or concerns that the Government

5     expressed in its protective request.  You know, he's not going

6     to give up his own statements.  You know, that's not a, that's

7     not a risk area.  That's the -- and if I pronounced his name

8     wrong, forgive me.

9              THE COURT:  Okay.  It's an interesting question.  Does

10    the Government have a thought on that?

11             MS. MOHSIN:  Judge, I would -- I think that the

12    protective order is appropriate before we turn anything over

13    for a number of reasons.  We --

14             THE COURT:  Let us, as I said to Mr. Swor, let us

15    assume for the purpose of this question that the protective

16    order, or something very close to it, has been entered and

17    approved by the Court.

18             On that assumption, what do you think about Mr. Swor's

19    question?

20             MS. MOHSIN:  Then it depends.  For some defendants,

21    it's going to be appropriate for us to turn it over.  And I

22    think that's a conversation we need to have

23    defendant-by-defendant, unfortunately.  I don't know that

24    that's -- to the extent that it relates to a defendant's own

25    statements --
```

```
 1              THE COURT:  Here.  What you can say as a group matter
 2   and on the record is, as you just mentioned, that is a
 3   discussion that ought to happen, and it ought to happen
 4   relatively soon.  Right?
 5              MS. MOHSIN:  Yes.
 6              THE COURT:  Okay.  As to a defendant's own statement,
 7   would that include a defendant's own grand jury testimony?
 8              MS. MOHSIN:  That is a discussion that has to be had.
 9   Correct.
10              THE COURT:  Okay.  Early?
11              MS. MOHSIN:  Yes.
12              THE COURT:  Any other thoughts on this category?
13              MS. MOHSIN:  No.
14              THE COURT:  All right.  So the answer I think, Mr.
15   Swor, is yes.  All right?  Or depending how you asked the
16   question, it may be no.  Is there any reason why it shouldn't
17   happen, I think the answer is no.  And I think that it will
18   happen, as far as the Government is concerned, on the
19   assumption that the protective order or something like it is
20   entered.
21              So again, pointing up the necessity of getting a
22   response in, finalized, analyzed and, and then that's going to
23   incline the Government, probably one way or the other with
24   respect to providing this information early on.  All right?
25              So what else do we need to know?
```

 1              Motion practice.  In the light of the volume of search

 2    warrants and wiretap orders, the Government proposes a

 3    discussion about the scheduling of motion cut-off dates,

 4    possible consolidation of defense motion, possible staggered

 5    motion cut-off dates.  That was in the Government's suggested

 6    list of items to discuss.

 7              It was reacted to in the defendants, in the group

 8    defendants' responses with some, I think there was general

 9    agreement that that discussion should take place.  Also, there

10    should be a discussion about the mechanics of seeking

11    concurrence or not, or opting out or not.

12              My thoughts to you, to the group, the group of 41, as

13    opposed to just the committee here, when we were on the record

14    the first, in the first meeting, I think is perhaps not as --

15    not as wise as I thought it was then.  In other words,

16    requiring people to opt out and making a bottom line sort of

17    default presumption that everybody joins except those people

18    that don't.  And I think that there are a lot of kinds of

19    motions that, to which that is just not going to be applicable.

20              And I think, I think that harkening back to the sense

21    of Rule 7.1(a), and actually seeking concurrence is probably a

22    better idea, but it's open for discussion.  And I think we

23    should formulate something that could be put into an order that

24    will actually govern these things:  Timing, concurrence,

25    scheduling, staggering schedules, cut-off dates and so forth.

1              MR. WEISS:  Your Honor, when you mentioned --

2              THE COURT:  Mr. Weiss.

3              MR. WEISS:  Art Weiss.  When you mentioned 7.1, I see

4    the wisdom of contacting the Government as to concurring or not

5    in the defense motion.  But is the Court altering its earlier

6    position that if one defendant files a defense motion, that the

7    Court would like 40 either opt-in or opt-out responses?  Or is

8    there going to be a default?

9              THE COURT:  I think it's going to depend upon,

10   frankly, the kind of motion that's being filed.  If a defendant

11   files a motion to, to suppress his statement made to an officer

12   at the scene of a traffic stop, I don't think 40 other

13   defendants have much to say about that, frankly.

14             MR. WEISS:  No.

15             THE COURT:  So I don't think it really, it doesn't

16   really bear upon anybody else's case.  I don't think there's

17   any -- thinking about that kind of motion, there's no need to

18   seek concurrence or opting out of anybody, because it's just,

19   it's such a targeted, such a targeted device.

20             Now, if a defendant proposes to file a motion to ditch

21   the entire indictment for some sort of allegation of fatal

22   defect or improper impaneling of the grand jury or something,

23   some global -- something of global impact, then my original

24   thinking has more merit.  There should be more, much more of a

25   consolidated point of view, it seems to me, expressed.  I don't

1    want 40 briefs on that, but rather, one, frankly.  And that

2    would require of necessity, a consolidation of effort, or an

3    opting out if, if so desired.

4         MS. RABEN:  And, Margaret Raben.  And that leads to my

5    point, which is joinders, notices of joinder.  I can certainly

6    imagine that there will be some motions filed, particularly as

7    we get closer to trial, where everybody is going to want to

8    join in.

9         I think the way this has to be done is whoever is

10   filing the motion files it, and then other defendants have the

11   option to join.  I don't know what the Court's policy is about

12   joinders, in terms of the mechanics of doing that.

13        THE CLERK:  I think it should happen before it's

14   filed.  Because we also don't want a motion filed, and then a

15   week later, a defendant joins in two thirds of it, but then

16   proposes another motion to do another third.  I think it should

17   be circulated amongst the defendants before it's filed.

18        THE COURT:  Much as the example that I was giving to

19   Mr. Weiss would imply.  A motion that is more universe --

20   potentially more universally applicable, it seems to me, should

21   be, should be filed, assuming that there's not concurrence from

22   the opposing party, should be filed in as much of a

23   consolidated version as possible, which would imply the need

24   for defendants -- defense counsel, to talk with each other.

25   And for Mrs. Raben to say I'm thinking of filing a motion in

 1    the following form, circulate it among the group liaisons, and

 2    saying should we get together on this, what, you know, what

 3    would you like to add; a draft of my brief is attached.  And

 4    something along -- something pretty close to that, it seems to

 5    me, would be, would be most efficient and most helpful.

 6              MR. WEISS:  So if there's going to be, say, a group,

 7    say for example, a search warrant, and there's seven defendants

 8    that have standing to complain about that, would you like that

 9    motion filed on behalf of seven defendants and have seven

10    attorney signature lines and what have you?

11              THE COURT:  Or just an indication that, that others

12    have joined.  I don't even know that it would take electronic

13    -- I guess you can add it.  It doesn't cost anything, add

14    electronic signature lines.  But just an indication, a

15    memorandum, a statement or something of that effect that, you

16    know, Defendant No. 14 is filing this motion, counsel for

17    Defendant No. 14.  I've consulted with the other six.  They all

18    agree.  And they've had a chance to review my, my brief and it

19    applies equally to all of them.  And I'll just take it as

20    applying equally to all.

21              MR. WEISS:  So you'd like some indication either in

22    the body or in the addendum clause as to --

23              THE COURT:  What we might even do is to create some

24    sort of a protocol, some sort of a standardized paragraph at

25    the beginning or the end that identifies exactly that state of

```
 1    affairs.
 2            MR. WEISS:  Okay.
 3            THE COURT:  I'm interested in your -- in some
 4    draftsmanship in that regard.
 5            MS. RABEN:  I am just --
 6            THE COURT:  To make a -- which by the way, if we do
 7    adopt that, would make this uniform and we would know exactly
 8    where to look for it, and it would be expected and it would be
 9    standard, and every motion would have something like that.
10    Either that or the obverse of it, which I suppose would be I'm
11    filing this only on my own behalf; nobody else agrees with
12    this.
13            (Laughter.)
14            THE COURT:  Or something roughly similar to that.  But
15    if it's in the same place in every, in every motion, we'll
16    know, we'll know more about it, and the opposing party will be
17    able to sensibly respond.
18            Mr. Straus?
19            MR. STRAUS:  It strikes me that since ECF only picks
20    up what we've styled the pleading as, it probably would make
21    the most sense to have the names of the defendants who are
22    joining or consolidating themselves within one --
23            MS. RABEN:  That's a function of how you file it
24    electronically.
25            THE COURT:  Is it?
```

 1          MS. RABEN:  If, say, Art writes a motion and he knows

 2    that five others of us are concurring, when Art files it, he

 3    needs to check off the names of everybody who is concurring so

 4    that it actually gets filed on their dockets.

 5          MR. STRAUS:  Right.

 6          MR. WEISS:  Right.

 7          MS. RABEN:  Their sub-dockets.

 8          MR. STRAUS:  I forgot about that.

 9          THE COURT:  We need a written protocol of how to do

10    this, counsel.  We need a written --

11          MS. RABEN:  All right.

12          THE COURT:  We need a written protocol.

13          MS. RABEN:  Okay.

14          THE COURT:  And there may be other details in that.

15    But I would like that.  Who wants to "bell the cat"?  Ms.

16    Raben?

17          MS. RABEN:  I will -- don't look at me.  I will look

18    at my absolutely "Cracker Jack" assistant, Kathleen Deja.  And

19    she will dictate to me what it should say.

20          THE COURT:  All right.  And if there's any feedback or

21    any information, Lisa Wagner would be an excellent resource for

22    her in terms of docketing, the NEF implications and so on.

23          And would you be able to fold into that protocol what

24    I'm imagining, or your suggestion as to what I'm imagining in

25    terms of like an introductory paragraph, which would, is of

```
 1   course readable.  Then the docket is what the docket is in
 2   terms of tick the box.
 3           MS. RABEN:  Right.
 4           THE COURT:  And file on behalf of these.  But also in
 5   the brief or in the motion itself, wouldn't it be sensible to
 6   have a paragraph, introductory paragraph that states
 7   essentially what has happened on the docket, in the course of
 8   filing?  At least consider the possibility.
 9           MS. RABEN:  Right.
10           THE COURT:  And your assistant can make whatever
11   suggestions.
12           MS. RABEN:  And the introductory paragraph simply
13   states who is filing, who is joining in, so that you don't have
14   to consult the dockets, you can consult the document and see
15   who --
16           THE COURT:  That's what I am imagining.
17           MS. RABEN:  Yes.
18           MR. WEISS:  Would the easiest thing be, just now come
19   the defendants, and you identify which ones?
20           MR. STRAUS:  Yeah.
21           MS. RABEN:  Yeah.
22           MR. WEISS:  By their respective counsel?
23           MS. RABEN:  Yeah.
24           MR. WEISS:  And that way, I don't even think we need
25   any additional magic language.  But then we've got to check off
```

1    what you're saying.  I don't know how to do that.

2            MS. RABEN:  You still have to check it off when you

3    file it.  And of course, if your client is in '066 and '129,

4    you have to file it on both documents as to the defendants --

5            MR. WEISS:  We already have to file in both, in all

6    three cases.

7            THE COURT:  All three, actually.

8            MS. RABEN:  Well, Smiley Villa is, my understanding is

9    he is the only defendant in that case.

10           THE COURT:  Why don't we get rid of that indictment.

11   Why don't you just fold, or at least approach Mr. Morgan about

12   folding that indictment into the '129.

13           MS. RABEN:  Your Honor, I will tell you if, if -- you

14   can't file anything in Smiley Villa's indictment -- in his

15   docket, unless you're Smiley Villa.

16           CASE MANAGER:  Unless they are listed as attorneys of

17   record on the case.

18           THE COURT:  Unless they are listed as attorneys of

19   record.

20           CASE MANAGER:  I can, but they can't.

21           MS. RABEN:  Well, I filed it.  We filed our liaison

22   report in Smiley's.  It says Group 3 liaison report, and it's

23   got my name as the filer on Smiley's docket.

24           THE COURT:  Okay.

25           MS. RABEN:  And the only reason we could do that is

1    because he's on -- he's in my group on the '129 case.

2          MR. STRAUS:  We could probably, with Mr. Morgan's

3    concurrence, file a superseding information under '129, and per

4    agreement, leave open the question of whether or not that would

5    be tried jointly with '129.

6          THE COURT:  Yeah.  I'm not saying --

7          MR. STRAUS:  But that would be the easy fix.

8          THE COURT:  That's it.

9          MR. STRAUS:  Waiver of indictment.  We'll propose that

10   and fix that.

11         THE COURT:  In making that suggestion, I'm not

12   implying anything with respect to trial grouping.  Just --

13         MR. STRAUS:  We can make that happen mechanically.

14         THE COURT:  Good.  And then, and then that would --

15   then we would be down to two, a double caption instead of a

16   triple caption.

17         MR. STRAUS:  Right.

18         THE COURT:  All right.  Okay.  Ms. Raben, do you think

19   that October 3rd date is a good deadline for you to try --

20         MS. RABEN:  Yes.

21         THE COURT:  -- hit as well?

22         MS. RABEN:  Yes.

23         THE COURT:  All right.  And would you then circulate

24   that?  I don't know, I'm not sure that I need you to file it on

25   the -- I suppose file it on the docket as a memorandum of

 1    suggested motion protocol and see what people, how people react

 2    to it.  And I can make it -- after a certain period of time,

 3    I'll simply adopt it and make an order that is predicated upon

 4    it, unless somebody has any better suggestions or reactions to

 5    it.  And we'll see to what extent that might help.  I hope that

 6    it does help.

 7            Now, then in terms of motion cut-off dates and so

 8    forth --

 9            THE CLERK:  Judge, what if by October 3rd, she

10    circulated it among the defendants?

11            THE COURT:  Yeah.  And not file it?

12            THE CLERK:  And not file it.  Let them react to her

13    and she can consider their suggestions and then file something.

14            THE COURT:  How about that?

15            MR. WEISS:  Give us another week.

16            THE COURT:  Circulate it.  And then in another week --

17            MS. RABEN:  All right.

18            THE COURT:  If you don't -- that's better.  Thank you,

19    Christy.

20            Yeah.  Circulate it amongst yourselves then, including

21    Government counsel, frankly, and solicit reactions.  And then

22    when -- and then a week, a week later, which would be on or

23    about the 10th of October, just file a memorandum with a

24    notation that this incorporates whatever suggestions you've

25    gotten, or there's been no additional information provided.

```
 1              MS. RABEN:  We will do that.  Although, I have one
 2   real world suggestion to make.
 3              THE COURT:  What?  Tell me.
 4              MS. RABEN:  And that is, when you ask somebody to
 5   respond or concur or get back to you, please include a date --
 6              THE COURT:  Oh, absolutely.
 7              MS. RABEN:  -- in the e-mail.  Because otherwise, it's
 8   just open.  And this will also, I think, encourage -- I have
 9   some people in my group who are going to get a little motherly
10   chat with me about -- because they are not reading the e-mails.
11   They are not, you know, they are not reading it until a week
12   later or four days later, or something like that.  And it's
13   just built into a big case that everybody's got to --
14              MR. SATAWA:  Stand up.
15              MS. RABEN:  Stand up and pay attention.
16              THE COURT:  It would be well for all group liaison
17   counsel to remind their participants of the need to be on top
18   of at least reading e-mails.
19              CASE MANAGER:  One thing I found in dealing with
20   things like that, when I send e-mails out, I always send it to
21   your secretaries.
22              MS. RABEN:  Yes.
23              CASE MANAGER:  And they are the ones that I go to, to
24   make sure that their bosses have seen these things.  I mean --
25              MR. SATAWA:  Your secret is out now, though.
```

 1          CASE MANAGER:  I know.  One of my secrets, but yeah.

 2          THE COURT:  Ms. Mohsin?

 3          CASE MANAGER:  I mean, please, you know, put them on

 4   the e-mail list or something when you send it.

 5          THE COURT:  Yes, Ms. Mohsin?

 6          MS. MOHSIN:  Judge, I think there's two issues that,

 7   along the same lines.  One of them is that I think the volume

 8   of e-mails that are going forward is somewhat problematic from

 9   the point of view of perhaps folks not reading every single one

10   or losing track of some of them.

11          So to alleviate some of that, I'm happy to put a

12   deadline in, in the -- when I've sought concurrence, send an

13   e-mail to 41 people, difficult for me to figure out who has

14   responded, let alone for the person who is trying to respond.

15   Days and days and days go by, I don't even get a response or an

16   acknowledgment they've received it.

17          Can we perhaps then just work with the liaison

18   counsel, and as far as seeking concurrence or --

19          THE COURT:  That's one of the purposes of liaison

20   counsel, in fact.

21          MS. MOHSIN:  So we would send our e-mail to the

22   liaison counsel.  I mean, we can "cc" everybody.  But from the

23   point of view of, of receiving a, like for instance, if we're

24   going to file a motion, I can send an e-mail to the four

25   liaison counsel and "cc" the entire 41-defendant panel.

1          THE COURT:  With secretaries.

2          MS. MOHSIN:  But expect -- yeah.  I don't have that

3    information.  I wish I did.  But expect a response back from

4    liaison counsel only, for purposes of my obligations.

5          THE COURT:  I think that's one -- that's one of the

6    reasons that we should have liaison counsel in place, in fact.

7          MR. SATAWA:  And then to just follow-up on Saima's

8    point, if I may, I don't have or possess Peggy Raben's grace or

9    way with people.  So as a liaison --

10         MS. RABEN:  You don't.

11         (Laughter.)

12         MR. SATAWA:  I know I don't.  As a way of --

13         MR. WEISS:  Don't hold back.

14         MR. SATAWA:  Your Honor, as liaison counsel, as Ms.

15   Raben stated, there are people that have never responded to a

16   single e-mail in our group to, to one of yours or one of mine

17   or one of, or each other's.

18         So I can presume that the Court is instructing liaison

19   counsel that you send me an e-mail, dear liaison counsel, we

20   propose we are going to file a motion to blah, you have until

21   October 3rd to respond.  I forward that to my group saying,

22   folks, I have until October 3rd to respond.  If I don't hear

23   from you by October 2nd, it is presumed that you don't have an

24   objection.

25         MR. SWOR:  The Government will be sending it to

 1    everyone already.  So you won't have to send a second e-mail

 2    out.

 3              MR. STRAUS:  That way, there's no issues on --

 4              THE COURT:  But the Government's expectation of

 5    response is not from 41.  It's from, from four.

 6              MS. RABEN:  Right.  No.  That makes sense.

 7              THE COURT:  Yeah.

 8              MS. RABEN:  And then do you want individual responses

 9    from each of the defendants within the group?  For instance,

10    Perkins, no; Villa, yes?  Or do you just want to know that

11    somebody?

12              MS. MOHSIN:  For the point of, your Honor, for the

13    point of concurrence, I would just want liaison counsel to say,

14    you know, everyone concurs, we have one objection, you know.

15              MS. RABEN:  Okay.

16              MS. MOHSIN:  Go ahead and file, you know.

17              THE COURT:  Well, frankly, if -- here, think about the

18    purposes of 7.1(a).  In attempting to seek concurrence, what

19    you're trying to do is to avoid the necessity of filing the

20    motion to begin with.  If you have concurrence, then file a

21    stipulation.  But that would require uniform concurrence, which

22    is going to be perhaps rare, but depending on the

23    circumstances, seek concurrence to try to avoid filing the

24    motion.  That's the essential point here.  So communication,

25    and reasonably rapid communication is appropriate.

 1              MR. SATAWA:  So my question still remains, your Honor,

 2     which is if this e-mail goes out to 41 lawyers and they do not

 3     respond by October 3rd, is Ms. Mohsin then allowed to presume

 4     that there's no objection, because somebody hasn't read their

 5     e-mail?

 6              THE COURT:  Well, I think you would be circulating a

 7     proposed stipulation at that point, saying if -- and have it

 8     signed off by, I would say by liaison counsel.

 9              MS. MOHSIN:  But, Judge --

10              THE COURT:  And all of this, by the way, would be

11     really good to be captured within the protocol for motion that

12     Ms. Raben is --

13              MR. WEISS:  Yeah.  I think it will bring it to

14     everybody's attention.  If they don't do something within that

15     definite period of time, then they may be "SOL".

16              MS. RABEN:  Because I noticed a couple of Saima's did

17     not have a response date.  And I thought, oh, that --

18              THE COURT:  We should uniformly, and again, again,

19     that is a point for your motion practice memorandum.  Deadline

20     dates should be maybe even in the subject line, urgent response

21     requested by "X" date, and then, and then the topic, whatever

22     it is.

23              I think that I would be satisfied with a

24     stipulation -- listen carefully, counsel -- a stipulation to

25     enter an order stating X, Y, Z, proffered by the Government,

STATUS CONFERENCE - 9/24/2012

```
 1   countersigned by four attorneys, that is the group liaisons,
 2   that it is stipulated to, between the defendants and the
 3   Government that the following happen.  And I'll sign off on
 4   that.  So I don't have 41 signatures, I've got five:
 5   Government, plus four.
 6          And the absence of objection from your group
 7   counterparts, I am imagining here, would be satisfactory as far
 8   as I am concerned, to indicate concurrence and approval.  And
 9   liaison counsel would have the responsibility of making, you
10   know, reasonably sure that this is a sensible, statutorily and
11   constitutionally sound proposition.  There's nothing apparently
12   wrong with it.
13          And that even if there has been silence, as opposed to
14   overt concurrence by your group counterparts, your group member
15   counterparts, it's still an appropriate thing to do in order to
16   mechanically advance the case to -- most of these things are
17   going to be frankly mechanical, as a matter of fact.  So that
18   that, I think again, if that were part of the protocol, I think
19   that it would be a suitable thing to do.  I would be interested
20   to hear anybody else, not here and now, but anybody else's, you
21   know, negative reaction to that.
22          Ms. Mohsin, something else on that point?
23          MS. MOHSIN:  I think, Judge, that one thing that might
24   advance the ball in that regard, is if each liaison attorney
25   were to contact their, the members of their group and obtain
```

1   multiple e-mails and individuals that are responsible for, for

2   them, to include into one list.

3           THE COURT:  That's the secretary idea.

4           MS. MOHSIN:  The secretary idea.  Or even I've sent

5   e-mails to one attorney, I have three different e-mail

6   addresses.  And for whatever reason, they didn't receive them,

7   they had some issue with their server.  But the point being

8   multiple e-mail addresses, multiple places where they obtain

9   information, just by way of making sure that when we -- because

10  this goes into one big -- I have one big category of attorneys'

11  names.  Everybody's names are in there.  I can put 20 more if I

12  have to.  I just have to press one button and it goes

13  everywhere.

14          And I think that what happens is that then, from the

15  point of view from defense counsel and these liaison attorneys

16  trying to reach everyone within a short period of time, if it's

17  gone to multiple addresses, the likelihood of a response, a

18  more quick response may be, may be increased.

19          But I can only send them to the e-mail address on ECF.

20  If I don't have additional information, if you can provide that

21  to me, I'm happy to send it to as many e-mail addresses or

22  secretaries or assistants or whoever.  But they need to

23  identify that individual for me, so that I can put that in the

24  e-mail and make sure it gets to everybody.

25          But I'm only going file the motion if the liaison

1    attorneys, all four, say no, no problem, we'll stipulate.

2              THE COURT:  All right.

3              MS. MOHSIN:  So I'm not expecting to hear from

4    everybody, just from those four.

5              THE COURT:  Good.  Mr. Swor, looked like you were

6    going to say something.  What was that?

7              MR. SWOR:  My thought is, and since we're not --

8    you're not deciding this issue right now, but my thought is, is

9    that silence cannot be adoption.  The practice in this district

10   has been silence has been, I believe we did it in the

11   Highwaymen case, that silence meant rejection.  But I'll go

12   back and look at Judge Edmunds' orders.

13             THE COURT:  I would appreciate that.

14             In the civil context where a motion has been filed

15   stating that concurrence was sought but not provided, when I

16   come to a point where I'm ready to hear the motion and I find

17   out that the opposing, the non-moving party in fact agrees,

18   relents, whatever, concurs at the motion hearing, I start

19   thinking about sanctions.  Because why did you, I mean, why did

20   you make him file the motion?  Why didn't you concur when you

21   were asked?  Why are you concurring?  Now, sometimes there are

22   reasons.  Sometimes there are rational reasons, but not always.

23             So I'm thinking this looks like a waste of time and

24   energy, possibly gamesmanship, possible other things that are

25   not good.  And to what extent that translates into the criminal

1    context, not perfectly by any means, but what it does tell me

2    is that if a reasonably sensible proposition is advanced to

3    achieve some goal, and concurrence is sought but not provided,

4    you might expect that I'm going to start asking why not at some

5    point.  And beyond that, I'm not sure what it implies.

6          But if there's a reason to not concur with a sensible,

7    confined, well-explained proposition, I would want to hear the

8    reason.  And it's probably not going to be a suitable reason to

9    say because I don't have to.  That's going to be at some point

10   unsatisfactory, I suspect, to me.

11         I'm not particularly firm on that just now.  These

12   are, these are off-the-cuff thoughts.  So, but I would like you

13   to explore what was done in other mass defendant cases where

14   silence was treated as opposition and so forth, and how that

15   actually worked in practice.  Any other thinking that you have,

16   you might talk with Ms. Raben and fold that into the memo that

17   she's going to be circulating.

18         MR. SWOR:  As you talked about, and it may be that on

19   procedural matters, silence is default and acceptance, and on

20   substantive matters, I mean, that may be where we're going.

21         THE COURT:  I invite you to participate in Ms. Raben's

22   drafting.  Thank you.

23         MR. SWOR:  I'm certain that I will.

24         THE COURT:  Thank you very much.

25         MR. SWOR:  Thank you.

```
 1              THE COURT:  Okay.  Can we say anything, can we say
 2   anything really about deadlines, cut-offs or anything?  This is
 3   just too early, isn't it?
 4              MR. WEISS:  I would think so.
 5              MR. KRAIZMAN:  Yes.
 6              THE COURT:  Do you think, though, that we could
 7   establish some kind of a, of a next date?  Perhaps some kind of
 8   regular check-ins?  I believe Judge Edmunds, for example, had
 9   regular meetings every four weeks with liaison counsel and
10   Government counsel, to kind of -- is that right?  Those of you
11   who were in?
12              MR. SWOR:  I don't think they were regular, but they
13   were --
14              MR. GLEESON:  Your Honor, for the record --
15              THE COURT:  Mr. Gleeson?
16              MR. GLEESON:  Yes, your Honor.  Thank you.  We did
17   have meetings, they weren't regular.  But she would call them
18   and we would generally be there.  I think it was maybe once
19   every six to eight weeks.
20              THE COURT:  Okay.  And that was during an equivalent
21   phase, during a run-up to --
22              MR. GLEESON:  The front end --
23              THE COURT:  -- motions actually.
24              MR. GLEESON:  The front end of the case, yes, your
25   Honor.
```

STATUS CONFERENCE - 9/24/2012

1          THE COURT:  The front end of the case.

2          It seems to me that it would be a good idea to

3     regularize it as much as possible, keeping people on track and

4     so forth.

5          Does Government counsel have any views in that regard

6     or suggestions?

7          MR. STRAUS:  It sounds acceptable.

8          MS. MOHSIN:  I think that makes sense.

9          MR. SATAWA:  Your Honor, may I just, at the risk --

10    Mark Satawa -- at the risk of asking a dumb question, which

11    I've never hesitated to do before.  You know, look, we all have

12    clients, and a lot of these clients are incarcerated.  And I'd

13    like to give him at least some sense of a time frame.

14         I mean, could the Government or the Court provide even

15    a wild guesstimate as to the discovery motion practice phase of

16    this case is going to take 12 months?  It's going to take six

17    months?  It's going to take 18 months?  It's going to take some

18    period of time?

19         THE COURT:  I think so much of that is going to depend

20    upon defense counsels' reaction to the volume of material they

21    have to review and their accessibility to clients in order to

22    review, to the extent that they need to go over these things

23    with clients.

24         My expectation with this, with the kind of

25    electronically stored information, electronically preserved

```
 1   information that the Government has, they could probably get
 2   out to defense counsel within, I'm going to say roughly a
 3   month, my expectation will be that they could transfer and
 4   transmit to counsel within roughly the next month, the things
 5   that are going to be initially provided.
 6           What do we want to presume how long it's going to take
 7   to review that?  90 days?  120 days?  180?
 8           MR. SATAWA:  She keeps shaking her head, so.
 9           THE COURT:  It's going to take -- if we presume that
10   it's going to take 180 days, just for example, for counsel to
11   reasonably review that information, even that I think is
12   aggressive.  But if we, if we presumed that, then I think, I
13   think that I would further presume that there should be a
14   roughly 90-day additional period for the presentation and
15   resolution of motions.  Now, we're nine months, ten months out
16   on my imagination here.
17           And after the resolution of motions, we're going to
18   have -- we're going to have to have further administrative
19   determinations of trial groups.  Some defendants will have left
20   the party by that time, I'm expecting, in the review process.
21   Additional discussions are going to be going on.  But my
22   thinking just in that regard is that we would not be seeing a
23   trial --
24           MR. SATAWA:  In 13 --
25           THE COURT:  -- until maybe about the 12th or 13th
```

1    month from now, just rough estimate.  That's what I'm thinking.

2    And that assumes that you can get through all the stuff in six

3    months.  Does that sound -- do you think any differently?

4              MS. MOHSIN:  I think it's optimistic, but I agree,

5    Judge.

6              THE COURT:  Optimistic.

7              MS. RABEN:  I agree, too.  I think it's optimistic.

8              THE COURT:  That's, that's the fall of, the fall of

9    '13.  It sounds offhand, like it would be an aggressive --

10   maybe the spring of '14 is more like it.

11             MR. SABBOTA:  Judge, Jerome Sabbota again, group --

12             THE COURT:  And I'm not wishing any of these things to

13   occur, but just roughly estimating.

14             Yes, Mr. Sabbota?

15             MR. SABBOTA:  I think there are couple of us in here

16   that are scheduled for trial on another mega case in October

17   2013 --

18             MR. SWOR:  October, 2013.

19             MR. SABBOTA:  -- in Flint.

20             THE COURT:  Well, we need to consolidate schedules and

21   that's going to play a part.  I mean, I'm not going to

22   obviously pre-ordain --

23             MR. SABBOTA:  Just so the Court is aware.

24             THE COURT:  -- anything a year from now in terms of

25   criminal trials.  What case is that, by the way?

```
 1              MR. SABBOTA:  That's the Norwood case in front of
 2    Judge Goldsmith.
 3              THE COURT:  Norwood what?
 4              MR. SWOR:  Howard Street Boys.
 5              MR. SABBOTA:  Howard Street Boys, the Howard Projects.
 6              THE COURT:  Okay.
 7              MS. RABEN:  The lead defendant is represented by
 8    Harold Gurewitz.  And the defendant is Alexandra Norwood.  And
 9    there's what, 14?
10              MR. SWOR:  Twelve?
11              MR. SABBOTA:  There's 14.  I have defendant number 2,
12    Mr. Walker.
13              THE COURT:  Okay.  Then it's expected to be a lengthy
14    trial?
15              MS. RABEN:  Well --
16              MR. SABBOTA:  Expected to take maybe 6 to 8 weeks, I
17    think.
18              MS. RABEN:  Yeah.  And I'm assuming that there will be
19    some defendants who will go to trial out of that case.
20              MR. SABBOTA:  My defendant will go to trial.
21              MS. RABEN:  Yes.  I think Harold's will go, too.
22              THE COURT:  Well, I don't know that we would want to
23    preordain a spring '14 trial period for this.  It may work out
24    that way.  But, but I think that, as Ms. Mohsin said, it sounds
25    as though fall of '13 would be, in any event, an optimistic
```

STATUS CONFERENCE - 9/24/2012

1    rendition.

2          MR. SWOR:  We can try Norwood in the morning, and come

3    down here and try this in the afternoon.

4          MS. RABEN:  I think that's a great idea.

5          MR. SABBOTA:  The Court will provide lunch.  The Court

6    will provide lunch.

7          THE COURT:  It's on the record.

8          (Laughter.)

9          MR. SWOR:  I've said dumber things on the record.

10          THE COURT:  So, Mr. Dickstein?

11          MR. DICKSTEIN:  Your Honor, may I just inquire, if I

12    can't, it's not a problem, but may I send a text message to my

13    secretary, just advising her to call the Court for me?

14          THE COURT:  Yes.  Go ahead.

15          MR. DICKSTEIN:  Thank you, very much.

16          CASE MANAGER:  Are we going to set a follow-up status

17    conference here?

18          THE COURT:  Follow-up, I'm sorry, Lisa?

19          CASE MANAGER:  Status conference here?

20          THE COURT:  Yeah.  Follow-up status conference here.

21    Can we do that in about, let's say five weeks, roughly?  What

22    would that be?

23          MR. SATAWA:  Can I see my phone to see my --

24          THE COURT:  Go ahead.  Go ahead, counsel.  Not in

25    court, but here, yes, not a problem.

STATUS CONFERENCE - 9/24/2012

```
 1              (Brief pause.)

 2         CASE MANAGER:  November 6th, in the morning.

 3         THE COURT:  November 6th, in the morning.

 4         MR. WEISS:  That's election day.

 5         THE COURT:  Yes, it is.

 6         CASE MANAGER:  Yeah.

 7         MR. WEISS:  Do you want to do election day?

 8         THE COURT:  Yeah.

 9         MR. WEISS:  Same time, 9:30?

10         MS. MOHSIN:  Oh, gosh, can we not do it that day, in

11    case I've got trial?  Can we do it the day after?

12         CASE MANAGER:  How about November 8th in the morning?

13         MS. MOHSIN:  That's fine.

14         THE COURT:  November 8th?

15         MR. WEISS:  I've got a matter in Macomb County that

16    morning.

17         THE COURT:  All morning?

18         MR. SATAWA:  That's also the Criminal Defense

19    Attorneys of Michigan seminar in Traverse City.

20         THE COURT:  Is what, November 8?

21         MR. WEISS:  Yes.  The 6th is good.

22         MR. SABBOTA:  The 6th is fine.

23         THE COURT:  What's the 5th?

24         MR. WEISS:  The 5th is Monday.

25         CASE MANAGER:  We have employee appreciation day.  You
```

STATUS CONFERENCE - 9/24/2012

1  have the judges' meeting.  We have a fairness hearing in the

2  afternoon.

3          THE COURT:  What's the fairness hearing on?

4          CASE MANAGER:  Coghlan vs. Sprint.

5          THE COURT:  I don't think it's going to take that

6  long.

7          CASE MANAGER:  No, probably won't.

8          THE COURT:  How about the afternoon of 5 November?

9          MR. KRAIZMAN:  That's good.

10         MS. RABEN:  What time?

11         THE COURT:  Three o'clock?  Three o'clock?

12         MR. WEISS:  Three p.m.?

13         THE COURT:  How does that work?

14         MR. WEISS:  Okay.

15         THE COURT:  Okay.  5 November, three p.m.

16         CASE MANAGER:  We need a speedy trial order.

17         THE COURT:  We need a speedy trial order.  Ms. Mohsin,

18  do you want to organize that and, and gain concurrence, one

19  would hope, for these purposes?

20         MS. MOHSIN:  Concurrence?

21         MS. RABEN:  Concur.

22         MR. SATAWA:  Concur.

23         MS. MOHSIN:  Okay.

24         THE COURT:  Otherwise, we're going to trial next week.

25         All right.  Are there any other topics that we should

STATUS CONFERENCE - 9/24/2012

1    discuss or that we should suggest that Ms. Raben fold into her
2    drafting of motion practice memorandum perhaps?
3              I don't hear anything else.
4              All right.  We'll be ready to discuss these things and
5    the progress that we've made.
6              Next time, we will have benefit of the outline of
7    materials that Ms. Mohsin has provided.  My hope is that you
8    will also have a decision on the motion for protective order.
9              And with that, my hope would be if it is approved as
10   the Government suggests, that by that time, the Government will
11   have already been able to provide individual statements to
12   defendants to whom they are attributed before that, that
13   conference occurs.  And then we will be looking at the
14   commencement of other, the form discovery mirroring hard drives
15   and the like.  Perhaps some of that will have already been done
16   as well.
17             MR. WEISS:  Your Honor, will you be resolving the
18   Government's motion for protective order without oral argument?
19             THE COURT:  My expectation is that I will.
20             All right.  Okay.  Counsel, thank you for being here.
21             MR. SWOR:  May defense counsel remain here?
22             THE COURT:  Yes, you may.
23             (Proceedings adjourned at 11:52 a.m.)
24                          *      *      *
25

1                    **CERTIFICATE OF REPORTER**

2           As an official court reporter for the United States

3    District Court, appointed pursuant to provisions of Title 28,

4    United States Code, Section 753, I do hereby certify that the

5    foregoing is a correct transcript of the proceedings in the

6    above-entitled cause on the date hereinbefore set forth.

7

8

9                    ___s/ Christin E. Russell___

10              CHRISTIN E. RUSSELL, RPR, CRR, FCRR, CSR

11                  Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25